UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
EPIFANIA NUNEZ,

                                       Plaintiff,

    -against-

JAY ZED LLC,
BROOKLIVE MANAGEMENT LLC,
JASON VORCHHEIM,
SMYTH LAW P.C.,
CHRISTINA SMYTH, and
CHRISTINA WILLIAMS,

                                Defendants.
----------------------------------------------------------x

Civil Action No. 1:24-cv-3949

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, by her attorneys at Brooklyn Legal Services and The Law Office of Ahmad Keshavarz, for her complaint against Defendants Smyth Law P.C., a debt collection law firm; Christina Smyth, the principal of the firm; and Christina Williams, an associate at the firm (collectively "Attorney Defendants") for violating the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* and New York Judiciary Law § 487, and against Attorney Defendants; Jay Zed LLC, a landlord; Jason Vorchheim, the registered managing agent for the building; and Brooklive Management LLC, a property management company, for violating New York General Business Law § 349 and committing negligence and gross negligence, alleges as follows:

## PRELIMINARY STATEMENT[1]

1.      Ms. Nunez is a low-income single mother and at all relevant times has been a participant

---

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

in the Section 8 voucher program as administered by the New York City Department of Housing Preservation and Development ("HPD"). She has lived at 66 Lewis Avenue, Apt. 07, Brooklyn, New York 11206 for twenty years.

2.      Defendant Brooklive Management LLC ("Brooklive"), the managing agent of 66 Lewis Avenue and agent of the owner of 66 Lewis Avenue, Defendant Jay Zed LLC ("Jay Zed"), and Defendant Jason Vorchheim, identified as registered managing agent for the building, (collectively "Landlord Defendants"), demanded payment from Ms. Nunez repeatedly for rent that she did not owe, specifically by billing Ms. Nunez repeatedly for a monthly rental amount in excess of her Section 8 share. Jay Zed, its managing agent Brooklive, and their attorneys, Defendant Smyth Law P.C. ("Smyth Law"), Defendant Christina Smyth, ("Ms. Smyth"), and Defendant Christina Williams ("Ms. Williams") (collectively "Attorney Defendants") made false representations in verbal and written communications that Ms. Nunez was obligated to pay money or face eviction, despite knowing that Ms. Nunez did not owe the rent they alleged she owed.

3.      On July 7, 2023, Attorney Defendants initiated a baseless eviction proceeding via Verified Petition in New York City Housing Court for fictitious rent arrears, late charges, and legal fees that Defendants knew Ms. Nunez did not owe. Ms. Nunez was forced to take time off work for court appearances and for meetings with her attorneys to defend against the baseless lawsuit, and she suffered emotional distress as a result of Defendants' actions.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to the FDCPA, 15. U.S.C. § 1692k(d), and under 28 U.S.C. § 1331.

5.      This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367

because they share a common nucleus of operative fact with the federal claim and are so related to the federal claim as to form part of the case or controversy under Article III of the United States Constitution.

6.      Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

7.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to Plaintiff's claims herein occurred within the Eastern District of New York.

## PARTIES

8.      Plaintiff Ms. Epifania Nunez is a natural person residing at 66 Lewis Avenue, Apartment 07, Brooklyn, New York 11206.

9.      Defendant Brooklive is a domestic limited liability corporation organized under the law of the State of New York with its headquarters and its principal place of business in 3008 Ave. J, Brooklyn, NY 11210.

10.      Brooklive is and was at all relevant times the property management company responsible for the day-to-day operations at 66 Lewis Avenue, including but not limited to sending rent invoices to tenants like Ms. Nunez.

11.      Defendant Jay Zed is a domestic limited liability corporation organized under the law of the State of New York and residing in Nassau County, New York.

12.      On or around July 19, 2021, Jay Zed and Quincy Marcus 504 Development Corp. executed and recorded a contract by which Quincy sold a number of properties, including 66 Lewis Avenue, to Jay Zed.

13.      Defendant Jason Vorchheim, identified as registered managing agent for 66 Lewis Avenue, is upon information and belief an employee or otherwise an agent of Brooklive and/or Jay Zed.

14.     Defendant Smyth Law is a debt collection law firm organized under the laws of the State of New York. Smyth Law engages in business in New York State and this suit arises out of the Smyth Law's business in New York State.

15.     Smyth Law specializes almost exclusively in collecting putative rental arrears. As of the date of this filing, it has commenced hundreds (if not thousands) of rental arrears lawsuits.

16.     Defendant Christina Smyth is an attorney at law duly admitted to practice in the State of New York with a principal place of business 355 Lexington Avenue, New York, NY 10017. Ms. Smyth is the owner and principal of Smyth Law.

17.     Ms. Smyth has signed hundreds of petitions to collect rental arrear debts owed or due to others from consumers, including Ms. Nunez, and she regularly does so.

18.     Defendant Christina Williams is an attorney duly admitted to practice in the State of New York and employed by Smyth Law.

19.     Ms. Williams regularly collects debts owed or due to others through her work at Smyth Law, including but not limited to regularly drafting oppositions to motions to dismiss.

20.     The Attorney Defendants were acting as the agents of the Landlord Defendants in their litigation and other attempts to collect the putative debt. Attorney Defendants were acting within the course and scope of their employment. Attorney Defendants were the freely chosen counsel of the Landlord Defendants. Therefore, the Landlord Defendants are jointly and severally liable for the conduct of the Attorney Defendants.

## **FACTS**

### **Ms. Nunez's Rent-Stabilized Tenancy and Section 8 Subsidy**

21.     Plaintiff Ms. Nunez is a single mother of five who has lived in her rent-stabilized apartment since 2004. She lives there with two of her children.

22.     The building Ms. Nunez lives in is managed by Brooklive LLC. Ms. Nunez receives a rent invoice from Brooklive each month by email.

23.     Ms. Nunez has lived in her apartment for twenty years pursuant to an original lease agreement with the then-owner of the building, subsequent renewal lease agreements with that owner, and subsequent renewal lease agreements between her and current owner Jay Zed.

24.     Ms. Nunez is a participant in the federal tenant-based Housing Choice Voucher Program ("Section 8") administered by HPD.

25.     Under Section 8 program regulations, each year HPD determines the share of the monthly rent Ms. Nunez must pay based on her income.

26.     The difference between Ms. Nunez's share of the rent and the actual legally regulated monthly rent is paid through her Section 8 rent subsidy, which, under Section 8 program regulations, is to be sent directly by HPD to Jay Zed or to Brooklive, its property management agent.

27.     Ms. Nunez "is not responsible for payment of the portion of the rent to owner covered by the housing assistance payment under the HAP contract between the owner and the PHA" and "[t]he PHA [*sic*] failure to pay the housing assistance payment to the owner is not a violation of the lease between the tenant and the owner." 24 C.F.R. § 982.310(b)(1)-(2); *see also Prospect Place HDFC v. Gaildon*, 6 Misc. 3d 135(A) (App. Term 1st Dep't 2005) ("A Section 8 tenant agrees in the Section 8 lease only to pay the tenant share of the rent." (citation and internal quotation marks omitted)); *Soumas v. Gregg*, 57 Misc. 3d 135(A) (App. Term 1st Dep't 2017) ("Here, no new lease agreement was entered into by the parties obligating the tenant to pay the full contract rent. Thus, a nonpayment proceeding does not lie to recover the Section 8 portion of the rent from the tenant."); *New Hempstead Terrace LLC v. Reeves*, 18 Misc. 3d 1113(A) (Dist. Ct.

Nassau Cty. 2008) ("This Court holds that petitioner cannot maintain a summary proceeding against respondent to recover in the first instance, absent a good faith allegation that a new agreement has been reached to make the tenant liable for the Section 8 rent.").

28.    The prior owner of 66 Lewis Avenue entered into a Housing Assistance Payment contract ("HAP contract") with HPD in which it agreed to comply with Section 8 program regulations in order to receive Section 8 subsidy payments, and Jay Zed became party to this contract upon its purchase of 66 Lewis Avenue.

29.    Upon information and belief, as part of the purchase of 66 Lewis Avenue, Jay Zed also received the Section 8 bank account maintained by the prior owner in which Section 8 subsidies for the tenants, including Ms. Nunez, were deposited.

30.    Under the terms of the HAP contract, the landlord must maintain the apartment in compliance with the "Housing Quality Standards" required under Section 8 ("HQS"), as defined by 24 C.F.R. § 982.404.

31.    If the apartment fails to pass an annual HQS inspection, HPD may suspend the Section 8 subsidy until the landlord has remedied the failures, and the apartment passes inspection. Additionally, the PHA is required to notify the landlord of any defects that must be remedied. 24 C.F.R. § 982.405.

32.    The HAP contract tenancy addendum provides that the tenant is not liable for payment of the Section 8 subsidy portion of the rent, and that the owner may not terminate the tenancy for nonpayment of the Section 8 subsidy portion of the rent.

33.    Further, New York appellate courts have held that a landlord cannot maintain a nonpayment proceeding against a tenant for arrears caused by the suspension of the Section 8 subsidy, regardless of the cause for suspension.

34.     Ms. Nunez has used her Section 8 voucher in her current apartment throughout her twenty-year tenancy.

35.     Ms. Nunez' monthly rental share established by HPD was $355.00 between December 1, 2019 (if not earlier), through and including January 31, 2024, and her current share is $859.00, effective February 1, 2024.

36.     Brooklive, in the course and scope of being agent for Jay Zed, has charged Ms. Nunez more than $355.00 per month since at least August 2021, overcharging Ms. Nunez by up to $165.65 per month.

37.     Because of the consistently erroneous overcharges on the rent statements Brooklive sent to Ms. Nunez, and because each month Ms. Nunez either paid the total amount she was responsible for pursuant to Section 8 each month or more than she was required to pay, the overcharges resulted in an accumulated rent credit of $3,061.06.

38.     Jay Zed overcharged Ms. Nunez, through Brooklive, by $55.27 each month from August 2021 through December 2021; by $87.03 each month from January 2023 through September 2023; by $122.84 each month from October 2023 through November 2023; and by $165.65 each month from December 2023 through January 2024.

39.     From August 2021 through March 2024, Ms. Nunez made thirty-two payments, nine of which amounted to the share she was responsible for at $355.00; two of which amounted to the share she was responsible for beginning in February 2024 at $859.00; and the remaining 21 payments amounting to overpayments as a result of Jay Zed's erroneous overcharges.[2]

40.     In or around December 2023, in the course of preparing a motion, *inter alia*, to dismiss a non-payment proceeding commenced by Defendants against Ms. Nunez (discussed *infra*), her

---

[2] Jay Zed entered a rent credit of $6.08 to Ms. Nunez on its ledger, which they did not dispute should remain a credit on her account for the relevant time period. This amount has been included in the total accumulated rent credit.

attorneys calculated how much Ms. Nunez had overpaid since August 2021.  To do so, they first calculated the total amount of rent that was actually owed by multiplying her share by the amount of months in the relevant time period (355 x 30 ; 859 x 2) which equals $12,368; then they subtracted that number from the total amount of rent she actually paid, which was $15,429.60.

41.      Thus, the Landlord Defendants have collected at least $3,061.06 in excess of the legally collectible rent from Ms. Nunez.

42.      Upon information and belief, HPD suspended Section 8 payment of Ms. Nunez's subsidy for the months February through April 2022; June 2023; November 2023; and December 2023, due to HQS violations for conditions Brooklive had failed to repair.

**Landlord Defendants Send Deceptive Rent Demands Seeking Money Not Owed by Ms. Nunez**

43.      In or around March 2023, a Brooklive employee, Jackelin Arana, called Ms. Nunez approximately three to four times, notifying her that she owed rental debt.

44.      During these calls, Ms. Nunez informed Jackelin Arana that, because she pays her Section 8 share timely each month, she did not owe any rent to the Landlord Defendants.

45.      Jackelin Arana asked Ms. Nunez to call HPD's Section 8 unit to investigate because HPD was behind on its share of the rent.

46.      Upon information and belief, the Landlord Defendants knew or should have known why HPD had not paid its share of the rent.

47.      In or around April 2023, an agent of Brooklive came to Ms. Nunez's apartment and knocked on the door.  When Ms. Nunez answered the door, the agent identified themself as an employee of Brooklive and asked her why she was behind on rental payments.

48.      Ms. Nunez informed Brooklive's agent that she was not behind, and that Jackelin Arana had told her that HPD Section 8 had stopped paying its portion.

49.     Defendant's agent asserted that Ms. Nunez was responsible for the full contract rent, whether it was her portion or HPD's portion, and that unless those rental arrears were paid, there would be consequences.

50.     Ms. Nunez grew worried that she would be sued in housing court for rental debt that she could not pay. She wondered if she could afford a payment plan and if she should agree to one if that was the only way she could keep her rent-stabilized apartment.

51.     Believing it was now her responsibility to resolve the matter with HPD, Ms. Nunez visited HPD's Section 8 unit to investigate why it had not paid its share.

52.     HPD informed Ms. Nunez that HPD had ceased paying because her landlord had failed HQS inspections, and that it could not resolve the matter until and unless the landlord sued Ms. Nunez in eviction court.

53.     In or around May 2023, Ms. Nunez arrived home late at night from her job as a health aide at a nursing home to find that a Fourteen-Day Rent Demand dated May 11, 2023, claiming that she owed $5,230.00 in rental arrears, had been delivered to her apartment. **Exhibit A** (14 Day Rent Demand).

54.     In this Rent Demand, Jay Zed did not specify the months that this total amount represented, but instead attached a rent ledger to the Demand covering the period August 2021 through June 2023. *Id.*

55.     The rent ledger included entries for HPD's Section 8 share of the rent as well as late fees.

56.     In or around June 2023, Ms. Nunez found a Five-Day Notice of Failure to Pay Rent dated June 13, 2023 at her apartment, wherein Jay Zed warned Ms. Nunez that a failure to pay her alleged rental debt could result in the commencement of a nonpayment of rent legal proceeding. **Exhibit B** (5 Day Notice).

57.    The May 11 and June 13 notices sought money that was not owed by Ms. Nunez.

58.    The rent ledger attached to both notices showed that Ms. Nunez had timely made her Section 8 rental payments, and thus the Landlord Defendants clearly knew that the amounts they were trying to collect were not owed by Ms. Nunez but instead had not been paid by HPD due to their own negligence in managing the building.

### Defendants File a Lawsuit Seeking Rent Not Owed by Ms. Nunez

59.    On or about July 7, 2023, Jay Zed, through the Attorney Defendants, commenced a non-payment of rent proceeding against Ms. Nunez in Kings County Housing Court, captioned <u>Jay Zed LLC against Epifania Nunez</u>, Index Number LT-320705-23/KI (the "LT Proceeding"). **Exhibit C** (LT Petition).

60.    The verified petition alleged rental arrears amounting to $5,230.00 and attached to it as exhibits the Fourteen-Day Rent Demand, the Five-Day Rent Demand, and the rent ledger. *Id.*

61.    The petition failed to plead that Ms. Nunez is an HPD Section 8 voucher holder, and the affidavits of service fail to show that HPD was served with copies of the pleadings as required by federal law when the respondent is a Section 8 voucher holder. *Id.*

62.    The petition listed Defendant Jason Vorchheim as the "Registered Managing Agent" for Jay Zed. *Id.* at p. 2.

63.    Defendant Christina Smyth, verified the petition, affirming under penalty of perjury "that she has read the foregoing petition and knows the contents thereof; that the same are true to her knowledge except as to matter stated to be upon information and belief; and to those matters she believes them to be true."

64.    Attorney Defendants either misrepresented that they had performed a meaningful attorney review of the petition, or they performed a meaningful review, saw the ledgers showing the money

owed was HPD's Section 8 subsidy rather than the portion to be paid by Ms. Nunez, and sued her anyway, knowing that Ms. Nunez did not owe the money.

65.     After receiving the pleadings, in July 2023, Ms. Nunez went to Kings County Housing Court to submit an answer to the petition and obtain a court date. **Exhibit D** (*Pro se* Answer).

66.     Once she had obtained the court date, Ms. Nunez called HPD's Section 8 unit for advice on how to proceed. HPD informed Ms. Nunez that an agent of HPD would be present on the day of the first appearance in the LT Proceeding, scheduled for November 16, 2023.

67.     On November 16, 2023, Ms. Nunez appeared before the court pro se and waited in the court room for her name to be called.

68.     Around noon, one of the Attorney Defendants came into the courtroom and introduced herself to Ms. Nunez, and asked Ms. Nunez if she knew how much rent she owed.

69.     This lawyer asked if Ms. Nunez was represented, and when Ms. Nunez said she was not, the attorney introduced Ms. Nunez to an officer of the court, who explained to Ms. Nunez how she could retain a free legal services attorney. The LT Proceeding was adjourned to January 8, 2024 for all purposes.

70.     Ms. Nunez retained Brooklyn Legal Services on November 30, 2023.

71.     Ahead of the January court appearance, Brooklyn Legal Services filed a subpoena to obtain records from HPD (**Exhibit E**), a motion to amend Ms. Nunez's pro se answer and a motion to dismiss on several grounds, including for the petitioner's failure to plead Ms. Nunez's Section 8 status, its failure to serve HPD with the petition and notice of petition, and for its improper predicate notices that demanded money from Ms. Nunez that she did not owe (**Exhibit F**).

72.     On January 8, 2024, counsel for the parties met in Housing Court for a scheduled appearance. After counsel for the parties discussed the facts in the halls of Housing Court,

including an explanation by Ms. Nunez's counsel to the Attorney Defendants that Defendants were illegally suing Ms. Nunez for the HPD portion of the rent, the Attorney Defendants refused to discontinue the case and indicated their intention to oppose the filed motion.

73.    Counsel for the parties entered into a stipulation of adjournment to set a motion schedule for submission of the papers. **Exhibit G** (Adjournment).

74.    Additionally, the Attorney Defendants agreed that their client, Jay Zed, and/or their managing agent Brooklive, would inspect and repair conditions in Ms. Nunez's apartment, which included infestations of rodents, roaches, and ants. *Id.*

75.    Between January 31, 2024 and February 28, 2024, counsel for the parties in the LT Proceeding exchanged several emails in which the Attorney Defendants denied that the reason for the suspension of HPD payments to the landlord was for its failure of HQS.  **Exhibit H** (Emails Between Attorneys).

76.    Attorney Defendants asserted that Defendant Jay Zed took over the building in 2021 and had not received any HQS notices. But Attorney Defendants could not provide any evidentiary support in their opposition papers, or in this email exchange, for any other basis for HPD suspending payments.

77.    Attorney Defendants requested from Ms. Nunez's counsel an extension to file their opposition papers, which Ms. Nunez's counsel consented to in exchange for a similar extension to file reply papers.

78.    Attorney Defendants filed opposition papers on February 20, 2024, one day before the scheduled appearance, to which they attached a single exhibit: the rent ledger that had been attached to both Rent Demands, updated to include months July 2023 through October 2024 in which entries for HPD's share and additional charges were included for the additional months.

**Exhibit I** (Opposition to MTD).

79.    The opposition was drafted and executed by Defendant Christina Williams.

80.    Either Ms. Williams misrepresented performing a meaningful attorney review of the papers supporting the opposition, which would have included at minimum a review of the attached rent ledger showing the debt was not owed by Ms. Nunez, or she performed a meaningful attorney review, saw that the debt was not owed by Ms. Nunez, but nevertheless opposed the motion to dismiss without a meritorious basis.

81.    On February 21, 2024, the case was adjourned to April 3, 2024, to set a new motion schedule and grant Ms. Nunez time to respond to Jay Zed's opposition papers.

82.    On March 25, 2024, Ms. Nunez filed her reply. **Exhibit J** (Reply).

83.    The reply attached irrefutable evidence that the rent was not owed by Ms. Nunez, and further that Jay Zed had been repeatedly put on notice of suspension of HPD subsidy payments due to its violations, specifically:

   a.    Exhibit A to the reply: Notices from HPD to Jay Zed dated March 30, 2022, February 19, 2021, and August 9, 2021, (pp. 9-54);

   b.    Exhibit B to the reply: The individual rent history of Ms. Nunez's apartment from the New York Division of Housing and Community Renewal (DHCR), showing a failure by Landlord Defendants to register in 2021, 2022, and 2023 (pp. 55-60);

   c.    Exhibit C to the reply: The most recent lease renewal, signed by Ms. Nunez on October 16, 2023 (p. 62); and

   d.    Exhibit D to the reply: The HAP Register for Ms. Nunez's apartment from 2020-2023 (pp. 63-66).

84.    Counsel for the parties returned to Housing Court for a hearing on the motion on April 4,

2024. The Attorney Defendants agreed that Ms. Nunez had a $0.00 balance through and including April 30, 2024.

85.      Counsel for the parties signed a stipulation to discontinue the LT Proceeding on April 9, 2024, agreeing that Ms. Nunez was owed a rent credit of $3,055.52, that Ms. Nunez's share of the rent was $355.00 through and including January 31, 2024, and Ms. Nunez's current monthly rent share is $859.00 starting February 1, 2024. **Exhibit K** (Discontinuance).

**Attorney Defendants' Pattern and Practice of Suing for Amounts Not Owed**

86.      The Attorney Defendants failed to properly verify Ms. Nunez's status as a Section 8 participant, and sued her for rent that she did not owe.

87.      The Attorney Defendants systematically file lawsuits seeking the share of rent paid by HPD from consumers like Ms. Nunez when HPD withholds that share of rent from their landlord clients.

88.      In most, if not all, of the nonpayment petitions, Attorney Defendants attach a rent ledger showing that the balance includes or is entirely made up of the portion of the rent covered by the Section 8 subsidy and not due or owed by the tenant.

89.      In other words, the Attorney Defendants either systematically misrepresent that they have performed a meaningful attorney review of the lawsuit prior to filing, or they do perform such a review, see that the consumer does not owe the rent through the very ledger they attached, but nonetheless sue the consumer for rent that they do not owe.

90.      Christina Smyth filed about 200 lawsuits seeking rent in 2023 alone. Accordingly, the Attorney Defendants' deceptive practice of seeking rent not owed has the potential to affect, and upon information and belief has affected, similarly situated consumers.

91.      Because Landlord Defendants own and manage multiple properties with tenants who receive Section 8 subsidies, and they use Attorney Defendants to file non-payment proceedings

for a substantial number, if not all, of these proceedings, the above deceptive practices of Attorney Defendants are *per se* also the deceptive practices of Landlord Defendants.

92.    Three recent nonpayment petitions in particular illustrate that this conduct has harmed (and certainly has the potential to harm) consumers beyond Ms. Nunez: (1) *8693 Bay Parkway LLC v. Evaristo Vasquez,* LT-315959-22/NY (**Exhibit L** (*Vasquez* Petition)), (2) *Jay Zed LLC v. Shemik Palmer,* LT-314729-23/KI (**Exhibit M** (*Palmer* Petition)), and (3) *8693 Bay Parkway LLC v. Victoria Elis,* LT-311027-23/NY (**Exhibit N** (*Elis* Petition)).

*Vasquez*

93.    In *Vasquez*, Attorney Defendants brought a nonpayment proceeding against a consumer on behalf of landlord 8693 Bay Parkway LLC. **Exhibit L**.

94.    The petition was executed by Defendant Christina Smyth, representing to the court and to the tenant that she had performed a meaningful attorney review of the petition. *Id.,* p. 2.

95.    She also affirmed "under penalty of perjury…that she has read the foregoing petition and knows the contents thereof; that the same are true to her knowledge except as to matters stated to be upon information and belief; and to those matters she believes them to be true." *Id.*

96.    Just as with the petition against Ms. Nunez, the *Vasquez* petition attached as an exhibit a rent ledger (*id.,* pp. 21-26) that showed on its face that $39,558.69 of charges were due to the Section 8 subsidy, and were not owed by Vasquez.

97.    On November 10, 2022, Vasquez (through his legal services attorneys Mobilization for Justice, Inc.) filed a motion to dismiss, which stated among other grounds that Attorney Defendants were seeking the Section 8 subsidy portion of the rent. **Exhibit O** (*Vasquez* Motion to Dismiss), pp. 7-8.

98.    On January 23, 2023, Attorney Defendants and Vasquez (represented by legal services

provider Mobilization for Justice, Inc.) filed a stipulation of discontinuance, which noted that "Petitioner is engaging in lease recertification efforts with the Department of Housing Preservation and Development ("HPD"), which is Respondent's Section 8 voucher provider" and "Respondent represents that he has paid his portion of the rent for at least the past eight years and reserves any and all defenses to future allegations of nonpayment of rent." **Exhibit P** (*Vasquez* Discontinuance).

*Palmer*

99.    On May 11, 2023, Landlord Defendants, by and through Attorney Defendants, commenced a nonpayment proceeding against Shemik Palmer. **Exhibit M** (*Palmer* Petition).

100.    The petition was executed by Defendant Christina Smyth, representing to the court and to the tenant that she had performed a meaningful attorney review of the petition. *Id.,* p. 2.

101.    She also affirmed "under penalty of perjury…that she has read the foregoing petition and knows the contents thereof; that the same are true to her knowledge except as to matters stated to be upon information and belief; and to those matters she believes them to be true." *Id.*

102.    Just like with the petition against Ms. Nunez, the *Palmer* petition attached as an exhibit a rent ledger (*Id.,* pp. 7-8) that showed on its face that $15,630.40 of charges were due to the Section 8 subsidy, and were not owed by Palmer.

103.    According to a stipulation filed in the case on November 16, 2023, "Respondent represents that rental assistance has been delayed due to [HPD] not having a fully executed lease." **Exhibit Q** (*Palmer* Stipulation).

104.    Regardless of the reason for HPD allegedly failing to pay the Landlord Defendants the Section 8 subsidy, they were nonetheless prohibited from seeking those amounts from Palmer or alleging that failure to pay those amounts was a breach of the lease.

105.    The *Palmer* case, per the New York State Courts Electronic Filing website, is still pending

as of this filing.

*Elis*

106.    On June 1, 2023, Attorney Defendants brought a nonpayment proceeding against a consumer on behalf of landlord 8693 Bay Parkway LLC. **Exhibit N**.

107.    The petition was executed by Defendant Christina Smyth, representing to the court and to the tenant that she had performed a meaningful attorney review of the petition. *Id.,* p. 2.

108.    She also affirmed "under penalty of perjury…that she has read the foregoing petition and knows the contents thereof; that the same are true to her knowledge except as to matters stated to be upon information and belief; and to those matters she believes them to be true." *Id.*

109.    Just as with the petition against Ms. Nunez, the *Elis* petition attached as an exhibit a rent ledger (*id.,* pp. 7-15) that showed on its face that the sought balance included Section 8 charges that were not owed by Elis.

110.    On December 5, 2023, the Honorable Judge Karen May Bacdayan issued an Order, noting that "Respondent is paying her ongoing rent, and remains at risk of eviction only due to DSS [Department of Social Services] delay," and threatened "If the checks are not issued, and available for tender on [January 4, 2024,] the court will join DSS pursuant to NY City Civil Court Act 110 (d) in this proceeding." **Exhibit R** (*Elis* Order).

111.    Seemingly the overdue monies from DSS were delivered to the landlord, as on January 31, 2024 Christina Smyth filed, and on February 1, 2024 the court so-ordered, a notice of discontinuance. **Exhibit S** (*Elis* Discontinuance).

**Defendants' Illegal Lawsuit Caused Ms. Nunez to Lose Sleep and Even Jeopardized Her Health**

112.    As a low-income single mother and Section 8 participant, Ms. Nunez is precisely the type of vulnerable consumer the FDCPA was designed to protect.

113.    Her life has been adversely affected by Defendants' actions. Defendants' conduct caused Ms. Nunez to sustain actual damages, including forgone wages because of missing work, and associated transportation costs, for travel back and forth to Kings County Housing Court and to meetings and consultations with her attorneys.

114.    Moreover, the mental and physical anguish and stress Ms. Nunez has experienced as a result of the LT Proceeding has plagued her for over one year.

115.    When Ms. Nunez first received phone calls from agents of Brooklive, she grew extremely distressed that her landlord was claiming she owed rent even though she knew she did not. When an agent of Brooklive showed up at her door to demand Ms. Nunez pay the alleged arrears, even though they were owed by HPD and not her, her distress intensified as she faced possible eviction if she could not pay what her landlord was claiming she owed.

116.    Throughout the last year, Ms. Nunez has suffered from severe sleeping problems. From the time she began receiving calls from Brooklive just over one year ago (March 2023), until the case was discontinued in April 2024, Ms. Nunez would often wake up after only two to three hours of sleep, worrying about the possibility that she, her developmentally disabled adult son whom she cares for, and her teenaged son would be rendered homeless. Ms. Nunez cried frequently throughout the housing court litigation, speaking with a dear friend weekly about the strain the case was putting on her health. Ms. Nunez felt so out of control during this period of time, she often turned to her faith in the middle of the night, praying that she would be able to remain in her rent-stabilized apartment.

117.    Ms. Nunez is afflicted with high blood pressure, and during the pendency of the housing

litigation, her doctor informed her that her blood pressure was dangerously high. The doctor's belief was that this was prompted by a stressful event. Although Ms. Nunez did not share with her doctor that she was in the middle of a Housing Court case for nonpayment of rent, her doctor noted the upswing in her blood pressure and increased the dosage on her blood pressure medication as a result.

118.    The mental and physical anguish of the possibility of becoming homeless affected Ms. Nunez's relationships with her children. In an effort to protect her children from the fear of losing their home, she tried to keep the existence of the eviction case secret, compounding the stress on her due to the weight of its potential outcome. As a result, Ms. Nunez's children were affected by the stress, with her developmentally disabled son often asking her what was wrong, and her teenaged son acting out in school.

119.    Before she was able to retain attorneys, Ms. Nunez constantly worried about fighting the case on her own, to the point that she considered signing up for a payment plan with her landlord, even though she knew she did not owe any rent. Intimidated by Defendants, and afraid to end up on the street with her children, Ms. Nunez thought it may be less stressful to pay off the alleged debt if it meant she could keep her home.

**FIRST CLAIM**

**Violations of Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.**
**(Against Attorney Defendants)**

120.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

121.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that debt collectors who refrain from using abusive debt collection practices

are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); *see also Hamilton v. United Healthcare of La., Inc.* 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

122.    Congress designed the FDCPA to be enforced primarily through private parties, such as Plaintiff, acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con,. 1st Sess. 5, ("The committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance . . . ."); and *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("In this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated Counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

123.    The obligation alleged to be owed by Plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the rental arrears were incurred for a residential apartment.

124.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt" as defined by 15 U.S.C. § 1692a(5).

125.    For the reasons set forth in the "Parties" section of this Complaint, the Attorney Defendants are each a "debt collector" as defined in 15 U.S.C. § 1692a(6).

126.    The Attorney Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f.  By way of example and not limitation, Defendant violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the

character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; falsely representing or implying that a communication is from an attorney; threatening to take and actually taking an action prohibited by law; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

127.    As a direct and proximate result of the Attorney Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, humiliation, increase of blood pressure, forgone wages because of missing work, and associated transportation costs.

128.    The injuries inflicted on Plaintiff by the Attorney Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

129.    Plaintiff suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to foregone wages and costs of transportation.

130.    Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: wrongful litigation, negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

131.    The Attorney Defendants had a duty to exercise reasonable care in the collection of debts, including in ensuring that a debt is not linked to the wrong party.

## SECOND CLAIM

**Violation of New York General Business Law § 349**
**(Against All Defendants)**

132.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

133.    New York General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state."  An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. L. § 349(h).

134.    As enumerated above, Defendants violated New York General Business Law § 349 by using deceptive acts and practices in the conduct of their businesses. These acts were done by Defendants systematically and, as such, have had a broad impact on consumers at large.

135.    Defendants committed the above described acts willfully and/or knowingly.

136.    The Defendants' deceptive conduct towards Plaintiff is the type of conduct that has a broad impact on consumers at large.

137.    Defendants' violations were willful and knowing, or, at minimum, evidence a conscious and reckless disregard for basic fairness and for the law. Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

138.    As a direct and proximate result of Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, and humiliation.

139.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits

in American courts.

140.    Plaintiff suffered economic injuries that historically have provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for forgone wages because of missing work, and associated transportation costs.

141.    Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: wrongful litigation, negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

142.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

143.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and unless enjoined will cause further irreparable injury.

144.    As a direct and proximate result of those violations of N.Y. Gen. Bus. § 349, Plaintiff has suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and damages, together with costs and attorney's fees.


### THIRD CLAIM

**Violation of New York Judiciary Law § 487**
**(Against Attorney Defendants)**

145.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

146.    New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with

intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

147.    New York Judiciary Law § 487 is a traditional cause of action in American courts; it is "the modern-day counterpart of a statute dating from the first decades after Magna Carta; its language virtually (and remarkably) unchanged from that of a law adopted by New York's Legislature two years before the United States Constitution was ratified." *Amalfitano v. Rosenberg*, 12 N.Y.3d 8, 14 (2009).

148.    Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of New York Judiciary Law § 487, and Plaintiff so seeks.

## FOURTH CLAIM

### Negligence Per Se and Gross Negligence
### (Against All Defendants)

149.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

150.    Had Defendants exercised even slight diligence they would have known their conduct was unlawful.

151.    Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

152.    Defendants' actions evince a reckless disregard for the rights of Plaintiff and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

153.    Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Plaintiff is entitled to a punitive damage award.

154.    Defendants owed Ms. Nunez a duty pursuant to the FDCPA, which is designed to protect consumers in part by prohibiting debt collectors from using false, deceptive or misleading

representations or means; misrepresenting the character, amount, or legal status of the debt; using false, deceptive or misleading representations or means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

155.    Creditors and debt collectors in general owe debtors a duty of reasonable care in collecting their debts. *Hawkins-El v. First American Funding, LLC*, 891 F. Supp. 2d 402, 412 (E.D.N.Y. 2012), aff'd 529 F. Appx. 45 (2d Cir. 2013).

156.    New York General Business Law § 349 also imposes on Defendants a duty to not engage in deceptive acts and unlawful practices in the conduct of their business.

157.    Defendants breached these duties.

158.    As a direct and proximate result of Defendants' breach of these duties, Ms. Nunez suffered compensable harm, including actual damages and emotional distress.

159.    Defendants' conduct was so flagrant as to transcend mere carelessness and constitute willful negligence or recklessness. Upon information and belief, Defendants have engaged in a pattern and practice of similar behavior against other tenants. As a result, Ms. Nunez is entitled to actual and punitive damages.

## DEMAND FOR JURY TRIAL

160.    In accordance with Fed. R. Civ. P. 38(b), Ms. Nunez demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

(a)    Assume jurisdiction of this action;

(b)     Declare that Defendants' actions violate the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 et seq., and New York General Business Law § 349;

(c)     Declare that Defendant Christina Smyth, Christina Williams, and Smyth Law P.C. violated New York Judiciary Law § 487;

(d)     Enjoin Defendants from committing similar deceptive practices in the future;

(e)     Award plaintiff actual and statutory damages pursuant to 15 U.S.C. § 1692k(a) and New York General Business Law §§ 349(c) and 349(h); punitive damages under New York General Business Law § 349; and treble actual damages under New York Judiciary Law § 487;

(f)     Award costs and attorneys' fees to the plaintiff; and

(g)     Award plaintiff such other and further relief as may be just and proper.

Dated: May 31, 2024

/s/ Ahmad Keshavarz
_____

Ahmad Keshavarz
Emma Caterine
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241
Tel: (718) 522-7900
Fax: (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com

/s/ Amanda  Perez
_____
Amanda Perez
Brooklyn Legal Services
105 Court Street, 4th Floor

26

Brooklyn, NY 11201
aperez@lsnyc.org
(718) 233-6413